I'd like to focus my time on the claim construction issue. Okay, let me just say at the outset, I found the briefs very hard to follow on the technology, and I'm sure we're going to have some questions about that. So I hope you both can do a better job explaining it to us orally. Okay, well, let me start there. I apologize for that. This being for myself, it seems to me there are two separate issues here. One is whether the patentee argued an inconsistent position from the claim construction that was offered in the re-exam. And that has to do with whether you could set aside under Rule 6eB the judgment for past infringement. But I think there's a separate question as to whether there is infringement based on the claim construction from the re-exam for the running royalty and future relief, which is a 6eB5 question. So I think one requires a showing of inconsistency in the argument in the infringement case. The other simply says that if you take this new claim construction from the re-exam, there's no infringement, which isn't sufficient to set aside the past judgment, but might be sufficient with respect to the running royalty. So go ahead and help us understand what the claim construction was that was offered by the patentee in the re-exam. Yes, okay. There's two major components to that lead-in, and you're right on both. So 6eB3, the fraud portion of Rule 6e, requires that there have been this inconsistency. I don't think inconsistency is fraud, but put that aside. Okay. But the district court focused on that really to the exclusion of any of the other bases for Rule 6e. And so when you look at the district court's order, never actually got into whether a new claim construction was required based on the re-examination or not. And that is one of the fundamental errors the district court, with all due respect, made. Because 6eB2 and 6eB5, you mentioned 5 goes to prospective relief, right? Also 6eB2, newly discovered evidence, don't require anything other than the fact that there have been a subsequent, newly discovered evidence that affects the scope of the claim. And so the claim... For 6eB5, you have to have a disclaimer, right? Well, you don't have to have a disclaimer per se. 6eB5 is equitable. You have to make a showing that it would be unjust, inequitable for the court to continue to enforce prospective relief or allow prospective relief. But you're not saying that during the re-exam that Opticurrent asked for the actual construction that the board adopted, right? They asked for the same construction that the district court proposed and that was used in the trial, but the board disagreed, right? Well, they did both, Your Honor. They initially tried to get the board to just use the same construction. Right, but when the board said no... When the board said no, your claim's not limited to... So they came up with an alternative argument under the board's construction. But then they won. So they had no ability to appeal that first, what they would have viewed as a claim construction mistake, right? They had no ability to appeal. I agree with that. I'm not sure we're disagreeing, actually. But as you say, they had no ability to appeal precisely because they persuaded the board by saying that the patent should remain valid by taking a completely different claim construction, a different view of the claim than had applied throughout the trial. But it was the board who adopted that different claim construction. Well, yes, the board was... So they had to live with a proposed alternative argument, right? That's right. That's right. So, look, at the highest level... The argument is that they have to live with the construction that they urged on the board and that the board adopted. That's all this case is about. This is a garden variety disclaimer case, right? Let me get this right. They didn't ever urge this construction on the board, right? They urged the same construction that the district court had used, right? No, no. Yes, they did. They did both. They did both, Your Honor. No. Once the board said, I don't agree with you, then they said, okay, even under your construction, we could still win, right? Yes, but in... Okay, but they didn't urge that other construction. In their... I actually don't agree with that, unless we're talking past one another. In their December 2019 response to the office action where the board said, hey, that first argument you tried about three terminals versus four terminals, that's not working, okay? Doesn't matter. Not concerned about number of terminals and where the power is coming in. Then they pivoted in December and said, okay, well, there's this additional feature that's disclosed in the specification that's not about terminals. It's about how the inverter is connected inside the chip. And that whole submission, this is appendix 289 to 291. They go on for pages about how that specific special connection that's described in column six of the patent, that exists as affirmative claim limitation. So they affirmatively argued, repeatedly, and their expert argued in a supporting declaration, that is what this invention really is. That is why the prior art is different. And they actually used the language. I can direct the court to it. And they said, the language in column six, this unconventional use of CMOS exists as claim limitations. That's appendix 390. So they absolutely urged this construction, and they succeeded. And so this, in its simplest form, is a simple disclaimer case. Now, Judge Dyke, to come back to your question about the technology and it being confusing, and again, I apologize. The disclaimer they won on has to do with the inside of the chip or the switch. Well, there's a VDD power rail inside the chip as opposed to connected to the fourth terminal of the chip. Correct. Correct. But even if we were to assume that that was the construction that they urged on the board and that that would disclaim any VDD power rail configuration even inside the chip, I have two questions. One is I'm not sure that they urged a different claim construction during the infringement trial. I mean, for them at the infringement trial, the question of whether there was a VDD power rail within the chip was kind of irrelevant. Well, two different things. They did not urge a different construction explicitly because there was no construction of this issue in the trial the first time around. Correct. But the second part, and this is critical, is they affirmatively had to rely on the connection between the inverter and VDD to make out their infringement case. Okay? And this, I think this is the fundamental issue that may have gotten obscured. Can I just stop you a minute and help? Sure. Because these terms are, I'm struggling with these terms too. Okay. What do you mean when you say VDD power rail inside the chip? Is that in contrast to a VDD power rail that's connected through a fourth element to a direct power supply? Yeah, no, those are different things. So VDD is a circuit structure inside the chip. It is a network of wires that distributes power inside the chip. And a particular component in the chip can connect to VDD or not connect to VDD. It's not the only way to get power inside the chip. The issue of where power comes in outside the chip, that was what the first trial was about. Let me just, because I can't keep all these thoughts in my head at once. We're not talking about any of that fourth element stuff here. You have a three element chip. They're saying their patent is a three element chip. None of this VDD power stuff is talking about the prior art that had a direct power source to the inverter. Well, it is. If I understand your question correctly, yes. The prior art distinguished during prosecution. Right. Right. It had the fourth element directly connected to power. Well, it had the CMOS inverter was connected to VDD inside the chip. But that VDD was connected to direct power. It wasn't powered internally within the chip. VDD is not powered internally. That's correct. I mean, ultimately. In the prior art. In the prior art. Right. In all these devices. Let me just, this goes to the. I think there's a bit of a confusion here because there are two connections one's talking about. One of the terminals of the chip that are connected to outside. And then within the chip, there are four connections for the CMOS inverter. And I got those two things confused a lot. And I think, as I understand it, they're quite different. Yeah. And that what nobody's contending now is that your chip was like the prior art, which had four terminals connected to a VDD power supply. The question is, did your chip have within it a VDD power supply internal to the chip connected to the CMOS inverter? Is that a fair statement? It is. It is correct. And in that last respect, where our chip, all the accused chips, and this is admitted by OptiCurrent, there's a direct connection between the inverter and VDD. That was also true in the prior art that was disclaimed. And that's the very thing that OptiCurrent disclaimed to save this patent. Judge Hughes, I want to come back to your. Yeah, I want you to point to me to something in the record. Would it help to point to any of your product information sheets in the diagram where you can show me where your inverter is and what it's connected to and what you're calling that? Look, let me tell you, I don't want to pull the punches. Here's the way I understand their argument. Their argument is our inverter is connected to a voltage stabilizer, and we get power because the current builds up at the voltage stabilizer, and that's enough to power the CMOS inverter, which requires a higher level of power than you usually get through the chip. Tell me if that's not your understanding of their argument, but that's my understanding of their argument, that their inverter is connected to a voltage stabilizer. Correct. Okay. I further understand. This is what I don't understand is, isn't your, and this is where you can show me on your diagrams, isn't your inverter also getting power through that same kind of voltage stabilizer structure? It's getting it, yes, but with a very important difference. And this is where I was trying to go in claim one. In our device, you've got the CMOS inverter. This is inside the chip. You've got a voltage stabilizer inside the chip, and in between you have VDD. So there is no direct connection in our chip from the CMOS to the voltage stabilizer. Can you show me that and explain what that means? Well, I can show you. In fact, it was the whole point of their infringement presentation at trial. They embraced this aspect of our chip because… Look, I have two different diagrams that I've been looking at. I don't know if either of these would help. Sure. I think these are your product names, either 1005, the LNK603, or either the LNK5841024. The datasheets. Yeah, the datasheets. The 1005 is better for me, but if it's not accurate, then… No, 1005 is fine. Do you have appendix 1005? Yes. Okay. So this is a block diagram for one of the accused devices. And you see the little round circles? There's four of them? Mm-hmm. Okay. Those are the external terminals on the chip. Okay? And in all of these devices, including the prior art, to power the chip, power has to come in through one of those terminals to power the chip. Right. Given. Okay? Correct. Here, I hate to get picky about this, but there's these words. You all are using these words, and sometimes you're using them very imprecisely. When you mean power has to come in, do you mean just passive current that throws through the chip or some kind of direct current that directly powers something? In your parlance, it would be current that powers something, that powers the components in the chip. And, in fact, what happens is the drain, you see the drain terminal? Yes. The upper right? Okay. That's not consistent with what they call, and there's an output? Yes. Okay. And that drain taps off of an external source to bring power or current into the chip to power the chip. Okay? And you can see it goes through the voltage. You see that regulator block? Mm-hmm. Okay. That's what they accused as being the voltage stabilizer of the claim. Okay. Okay? Now, you don't see it on this block diagram, but that voltage stabilizer in turn connects to what they said was the CMOS inverter. And the reason you don't see it here is you have to go to a detailed schematic. So inside the chip there was a collection of transistors. They said that's the CMOS inverter of the claim. It's connected to that regulator block, and it was connected by way of VDD. VDD is an internal network of wires that distributes the power inside the chip. Okay? So think of it as a third separate structure. Is that anywhere on this diagram? It isn't labeled per se on this diagram. It's in our internal schematics, which are in the record. One place you can look is Dr. Zane's infringement report. I'll just see if I can get you a representative page here quickly. Are you saying that they disclaimed having VDD inside the chip? They disclaimed a connection, yes. They disclaimed any connection of the CMOS inverter component to VDD. They said you can't have that. You have to connect it directly to the voltage stabilizer. That's the gee whiz. That's the improvement. That's what column 6, lines 1 through 17 show. The prior art doesn't have that. The prior art connects this inverter to VDD. That's the conventional way. That's the old way. That's not how we do it. That's a new claim construction, number one. Prospectively and in the other cases that are out there, they sued us again, so that's got to be revisited in that case or dealt with in that case. But the other problem, and this is why 60B3 applies, is it was necessary to prove infringement in this case. They had to rely on the inverter being connected to VDD. And why is that? I have a problem. I understand your argument about how they disclaimed internal VDD. Yes. Well, let's accept for the moment that that's the case, that they did disclaim that. So the claim construction now is there's no VDD inside the chip. Okay. Help me understand why it is, and I think you've explained also why your chip does have VDD inside the chip. Right. And so it wouldn't infringe under the claim construction that hypothetically they convinced the board for. I understand that. Okay. What I'm stumbling over is whether their infringement argument at the trial was inconsistent with what they told the PTO. Yes, it was. And here's why in two sentences. Okay. Claim one requires the CMOS inverter to be connected to four items. Okay. Which I think you observed earlier, Judge Dyke. One of those items is the voltage stabilizer. So the claim says the inverter has to be connected to the voltage stabilizer. In our devices, that connection is through VDD. So it was necessary for them to trace in the schematics, and this is in the record Appendix 732, Judge Hughes, to give you a specific example and answer your question at the same time. Appendix 732, when they circled these things in the schematic, they circled the CMOS inverter in yellow, and the testimony was, okay, that's the inverter. Do you see 732? I'm on 732. The whole yellow block is the inverter. Well, it's sort of the faint yellow block in the top. Yeah, I understand. Yeah. That's what they alleged is the inverter, right? Right. And you see above that, there's this little T symbol highlighted in green? Yeah. That's their highlighting, okay? And they did this consistently on all of our schematics. That's VDD. Our CMOS inverter in every single chip is connected to VDD, the conventional way. And the reason they had to highlight this. The reason VDD and PowerRail. PowerRail, same thing. They're the same. They're the same thing. It's a physical structure inside the semiconductor chip. Wait. Yes. Yeah, and I'm sorry to keep interrupting you, but when you say this green box is VDD connected in the conventional way, does that mean it's connected through a fourth element to power? Or this is internal VDD? This is internal. The fourth, the third, the fourth, nothing to do with this. So where is the VDD drawing its power from? It is getting it, again, it's not on this page. VDD is getting its power from the voltage stabilizer. It's getting it from the output, right? Yeah, from the output. Okay. Can I just, is this your argument? Their argument is their converter hooks directly to the voltage stabilizer, which is where you get the power. Yours is you have a structure in between that's called a VDD. Otherwise, it's exactly the same. That's exactly right. That's exactly right. And what is the VDD structure in your thing? The VDD structure is, well, it's represented as wires. It's referred to as a power rail, a supply rail. It's this network of wires or rails inside the chip that distributes power inside the chip. And it's used to power things other than the seamless inverter. Oh, for sure. Yeah. It's generally available in the voltage stabilizers only for the seamless. Well, in the new claim construction that, you know, their new conception of what their invention is, this inverter can only connect directly to the voltage stabilizer and not to VDD. Yes, but in their invention, the power that's flowing through the voltage stabilizer flows throughout the rest of the circuits and can power other things, too. That's true. That's true. But one thing it can't do in their invention anymore as a result of the re-exam is they can't use VDD. They cannot any longer point to VDD as being within the scope of their invention when it's distributing power inside the chip. They gave that up plain as day, and that is the fundamental contradiction because in our devices, A732 is one example of many. And they're in the record. Our inverter is always connected to VDD inside the chip, always, just like the prior art they disclaimed. I'm sorry. When you say the prior art they disclaimed, are we talking about different prior art because some of the prior art they disclaimed, the VDD, the CMOS inverter, because maybe I'm completely misreading this, but it seemed to me that some of us said the CMOS inverter requires a higher voltage level. And so in some of the prior art, the CMOS converter was powered externally from the chip, not internally. Is that wrong? No, you're not wrong. That can be true. So when you're saying yours is connected in the prior art conventional way, you're not saying it's connected that way, right? I'm not saying it's the same as necessarily all of the CMOS inverters in the prior art were connected to external power in a way that didn't go through the voltage stabilizer. There was a fourth element that did it. Now, I have to say I don't know the answer to that question on this record because the CMOS – But that seems a large focus of some of their prosecution history. Well, I think, actually, with respect they focused on the other category of CMOS inverter, prior art CMOS inverters, the ones that were connected to VDD. And those are the ones they said. They said Morris was like that and Newfer was like that. Let me stop you. So in your view, those two you just cited to me, those also are connected internally. There's no external power supply coming directly into the VDD. Well, there always has to be external power coming in. I know. This is the problem with this case. You all are using the same words to mean different things. And I'm not an electrical engineer. Okay. And I can't tell when you're using which word in which sense. When I'm talking about external power supply, I don't mean just the current flowing through to the voltage stabilizer. I mean at least some of the prior art that mentioned power coming through a fourth separate element that's powered it directly rather than this power buildup through the voltage stabilizer. Do the two references you just mentioned talk about power coming through the voltage stabilizer to a VDD and then going to the inverter or power directly coming from the outside to a VDD to the inverter and not from the stabilizer? It's the former. Okay. The former. The prior art inverters that were disclaimed have the inverter connected to a voltage stabilizer by way of VDD in the same way the power integrations change. See, this is interesting. Your briefs were like talking past each other. How do I verify that? I mean the district court listened to the testimony. He had a bunch of hearings on this. Their expert is saying something completely different. I read their expert, and it doesn't match up with what you're saying. How am I supposed to do a de novo factual review of what's true here and what's not? Well, you don't have to do a de novo factual review because on the critical factual issue there is no dispute. There's no dispute about how the prior art inverters were connected directly to VDD. There's no dispute that in our devices. But it was the external power that was described as the conventional way, correct? That's what they were distinguishing. No, the conventional way was connecting the inverter. Let's go back to A291 again because they actually say explicitly what they mean when they said the conventional way. All right? Oops, bear with me. Sorry, lost my spot here. Not 291. I'm sorry, I gave you the wrong. It's A390. It actually starts at the bottom of A389. The last sentence there. The 623 patent documents the incorporation of a CMOS inverter in a nontraditional and unconventional manner. So what's nontraditional and unconventional is how the CMOS inverter is used. And then they quote column 6, lines 1 to 17, which I won't read obviously here, but is all about the connection. The word connection appears here about a half a dozen times. The connection of the CMOS inverter and how it's connected inside the chip. Okay? And in particular, they say a conventional, well, let me start before then. The CMOS inverter of the invention is connected to the remainder of the circuit in a nontraditional manner. Specifically, a conventional CMOS inverter is connected to a pair of complementary supply voltages. That's VDD. Wait, can you? Sorry, I just want to parse more of this because, again, all these words are hard to translate between the two of them. You go on and it says with the source of the P channel MOSFET connected to a positive supply voltage is run to the ground. What is that positive supply voltage? The connection described there is shown in figure 2 of the patent where the CMOS, this is in the preferred embodiment, the CMOS inverter in figure 2, which is item 139, is connected directly to the voltage stabilizer. But that's not what this is talking about. This is not what I'm asking you. I'm asking you, you're saying this is what they're describing as the changes, and this is a sentence saying the conventional CMOS inverter, which is not their invention, is connected to a pair of complementary supply voltages with the source of the P channel MOSFET connected to a positive supply voltage. What does positive supply voltage mean? That's in the conventional, that is VDD. In the conventional way, the inverter is connected to positive supply voltage is VDD, and their experts said that. Our experts said that. There's no dispute. It was VDD coming from the fourth terminal from the external source. That was the conventional way of doing it, correct? That was a conventional way, yes. So when you say they defined conventional way, that's the way they defined the conventional way. But they're not talking. Positive supply voltage throughout this is used to reference power coming through that fourth element. There's a different term for the type of power that's coming through the other way, source-to-source or something like that. The reference to source-to-source here maps directly, and these numbers map directly to the connection shown in figure 2, which is the CMOS inverter connecting directly to the voltage stabilizer with no VDD. That's not answering my question. Because you're using this to argue that they recognize the prior art is your chip connected from the inverter through VDD to this other thing we're talking about that I've forgotten the name for. And I'm understanding this, and they're going to get up on their side, and I'm pretty sure they're going to tell me that what this means when they're talking about positive power supply is the prior art where there's something that comes directly in through an external power source outside to the VDD to power the inverter. And if we can't understand the difference between these two, and you can't keep them straight for me,  So I'll let them speak for themselves. I won't. But, again, it comes back to this distinction between outside the chip versus inside the chip. Well, your argument, as I understand it, is that their statements to the PTO, which they made in order to preserve the patent, were broader than VDD coming through a fourth terminal. It was any VDD, including internal VDD. And the statements, there are statements where they say there's no VDD. Right. And you're interpreting that as being broader than there's no VDD coming through a fourth terminal. Right. Because the PTO had already said that's not a sufficient distinction. Correct. And, in fact, they say, and, again, I won't. Is this the piece of evidence you're using to show that, though? I want to know where you're getting that from, that what they've disclosed is not just external VDD but internal VDD, and which piece of evidence you're pointing to. Because if this is it, I don't get it from this. It is, this is part of it. It is because everything referred to here is internal, and they go on to explain how it is the internal connections that matter, and the claim recites four internal connections, and it does not say there's any connection to VDD. And then they say, and they repeat over and over again, there cannot be that in our invention the inverter is connected to four things, none of which is the power rail, which is VDD. No power rail connection exists. The traditional connection is to the power rail. We don't have that. Over and over and over again here on pages 390 to 391. What they're talking about there is the internal connection between the CMOS and a VDD power rail? Exactly. Exactly right. That's what they're talking about. And just again, and I appreciate the frustration, Judge Hughes, because there was so much confusion in the record and in the way this was presented by OptiCurrent. But just to take high level, there is no discussion in this key office action response about three terminals versus four terminals and where and how our power is entering the chip. It's not there. And that's the striking thing. They tried that in their patent owner response in July. The patent office, the examiner comes back and says, no dice. I don't care. I don't care if you have three terminals or four terminals or where the power is coming from. Not interested. And that's when they pivoted and they dove inside the chip. They fastened down this one paragraph from column six that's all about connections inside the chip. And they said, and that's why we're different and that's why we should keep our patent. And there's nothing about terminals, external terminals, or power coming in the chip through external terminals. And that is the fundamental confusion and I appreciate it because the whole first trial was about that outside piece. This case was up here before you on the issues surrounding power coming into the external terminals on the chip and what that meant and how that worked. That was the first case. That was the trial. They won. We went to re-exam. And to stay alive, they reinterpreted their patent and said, you've got to have this special connection inside the chip. That's where we are. That's what this case is about. So if we agree with the district court that there was no inconsistency for the very reasons you just said, which is there was no inconsistency because the issue wasn't really raised below. It wasn't relevant below. Right? No, I can't agree with that because the reason the judge says there's no inconsistency is he thought that at the end of the day, he thought that the re-examination disclaimer somehow did in fact relate to the external power coming into the chip. And that's wrong. What he said is that the issue at trial only had to do with the external. That's true. We agree with him on that. Right. And you agreed before that there was no reason to even address this issue below, that you didn't address it, that no one else addressed it because it was all focused on this fourth terminal. Right. Okay. Right. So if we agree with the district court that that means it's not inconsistent, even if for some reason you think that what they're saying now doesn't read on your product, that's not an inconsistency with respect to how they tried the case. So if we agree with that, then what are you stuck with? You're stuck with 60 v. 6? No, because there is still the factual inconsistency that in their case at trial under the claim constructions that applied at that time, they necessarily relied on the connection between the inverter and VDD. Yeah, but you need fraud, right? Well, true, true. Okay. But so they based their case on that connection, among other things. That was critical to their case. The inverter has to be connected to VDD because that's the only way you get a connection to the voltage stabilizer. Their expert said it in his report. Their expert said it in his report. I just don't see fraud here. I mean, what seems to me likely happened is they got in trouble at the PTO. They came up with a new argument to preserve the patent, and it might have been inconsistent with what everybody was assuming at the time of the infringement trial. But I don't see that as being fraud. I mean, to have fraud, you'd have to have them thinking, oh, well, we are thinking that this is the right claim construction at the time of the trial. I mean, that seems to me unfair. Fair enough. Maybe I should end there and pardon me. I've been very generous with the time. We don't have to prove fraud to prevail on this appeal, right? That's one of the four bases we urged. I come back to you've got two different issues, one to set aside the judgment for past infringement, which requires something in the nature of inconsistency. And the other one is whether the running royalty should be set aside. And that doesn't require a showing of inconsistency, only that there's a new claim construction, that is a new legal determination, which makes the product non-infringing. But I think what I struggle with is forget about the running rule. Just talk about the past infringement. And I'm not sure that I see a basis under Rule 60B for setting aside that original judgment because the party's understanding of these issues evolved before the PTO. And at the time of the original trial, people were thinking differently about it. I'm not sure that's a ground for setting aside the past infringement judgment. So the answer to that is 60B2, newly discovered evidence. Not fraud. Doesn't require contradiction. Newly discovered evidence in the form of what they contend and believe the scope of their claim is. And this is the TDM America case that we cited for that proposition. They don't disagree with the legal proposition. And so if you believe that what happened in the re-exam is newly discovered evidence per TDM America. Well, you'd have to believe that. That's the problem is that that's pushing the concept of newly discovered evidence very far. Well, the trouble with newly discovered evidence is that it has to be evidence that existed at the time of the original trial. And the statements that they made at the PTO didn't exist at the time of the original trial. The statements they made didn't exist. True. But presumably they believed the same thing then they believed during re-exam. Let me put it this way. There's no evidence in the record that it just occurred to them during re-exam suddenly that this was a key feature of their invention. Especially where it's laid out in column 6 for 17 lines. This is the preferred embodiment. This is this key gee whiz in our invention. So they knew that back at trial. Clearly they knew it. Everyone knew it, right? And it wasn't until they got confronted in re-exam with prior art that was going to knock them out that they said, well, actually the claim, claim 1 is this comprising claim. It's irony. A comprising claim. We're going to limit it to just those connections shown in column 6. Even though it's a comprising claim. That's the issue. And that is what was newly discovered. And under TDM America, that should qualify. All right. Well, I think we're out of time. We'll give you a couple minutes for a rebuttal. We'll hear from Mr. Gunter. Okay. May it please the court. It was not an abuse of discretion when Judge Chin issued a well-reasoned and methodical opinion. Let's get into the merits of this. Focus first on the running wild. If, in fact, they disclaimed an internal VDD power rail, and we conclude that the product, in fact, has an internal VDD power rail, that's a basis for relief under 60B-5 with respect to the running wild. I'm not talking now about the past damages, but as to the running wild. Correct? It doesn't have to be an inconsistency. But I don't think they get there, Your Honor. I'm correct, right? I believe that's correct. On those assumptions, I'm correct, right? I believe that's correct. But I'd like to walk through and clarify for the court several different examples here of exactly how Judge Chin walked through the path. He didn't address that. I didn't see that he addressed that question that I just asked you. He says there's no inconsistency. He may have been correct about that. It may not be an abuse of discretion. But I don't see that he addressed the 60B-5 issue. Your Honor, what Judge Chin said was on Appendix 9 on there. And you're right. He said there was no newly discovered evidence within the meaning of 60B-2, but then also continued his explanation saying, for the reasons stated above, there's no clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct. And he cites the 60B-3 and continues, the injunctive relief was, for the same reason, not inequitable under 60B-5. But that's not correct, right? Because you don't have to have an inconsistency to set aside the future relief. I mean, there are a lot of Supreme Court cases that parties didn't side the Wheeling Bridge case and so on and so forth. You can't keep an injunction. You can't keep prospective relief if the judgment was wrong in the first place. Well, I might agree with the broad statement there. I would refer to you to the Court's use of the inequitable aspect of this. And what the Court was saying was that it was not. There's just no findings about this issue, about whether the statement that I made was correct or incorrect. That is, that there was a disclaimer in the re-exam about the scope of the petition and that given that disclaimer, there's no infringement of the patent in the future. He just doesn't say anything about that. You're correct, Your Honor. Okay. So if I could turn back for a few moments and offer to clarify what I heard Mr. Scherkenbach to walk through just a moment ago. So as an initial point, the original re-examination application or petition had five grounds, the first three of which were based largely on the patent's prior 3-2-3 design and the Neufer and Morris reference standing alone. After the patentee's statement, those were discarded. And then it was just looking at really the last two grounds for alleged invalidity. And that was under a combination of the 3-2-3 patent, which is a three terminal design. It does not have a fourth terminal connected to power supply. In combination with a CMOS inverter that's shown in either Neufer or Morris. So that was the task at hand in the section that Mr. Scherkenbach was pointing to at Appendix 390. The examiner thought you could take any CMOS inverter and simply drop it into the 3-2-3 design and arrive at the patented invention. That was not the case. And that's what the patentee's counsel walked through with the examiner. But on that same page, the paragraph below that description, it does say that none of which is a power rail when you're describing the unconventional use of CMOS. Now, if you're completely disclaiming any power rail, is that in your view the same thing as a disclaimer of any VDD? No, Your Honor. So there was not a disclaimer of VDD here. What there was was an explanation that you could not take any CMOS inverter and add it in because the 6-2-3 patent uses a CMOS inverter in an unconventional manner. And so that's what this paragraph found in Column 6 of the patent is describing. You can have two different ways of using a CMOS inverter. You can use it in the traditional way, which is connected to a fourth terminal power supply. That's the plus V voltage that's mentioned here that Judge Hughes, you had some questions about earlier. Can I just stop you and interrupt? Is any of the prior art showing a three-element circuit with a CMOS inverter connected to an internal VDD rail? No, it is not. So the prior art with three-element used something different than a CMOS inverter. So there's two categories here. The 3-2-3 design did not have a CMOS inverter in it. The Morris and Neuffer references were both four terminal devices that used a CMOS inverter in the conventional way, namely connection to the fourth terminal VDD. And so that's the breakdown that the patent is describing, that you can have two different types of connection. And so, Judge O'Malley, to your point a moment ago, whenever the counsel for patentee stated there's no connection to power in a conventional way, meaning the prior art is not, excuse me, that claim one is not claiming a conventional connection. What claim one is claiming is a CMOS inverter that's connected to a voltage stabilizer, which in turn derives its power from the third terminal, the drain terminal. So that's a point that OptiCurrent's expert, Dr. Regan Zane, made many times. Okay, even if we're there with you, I think I further understand their argument to be that yours connects directly between the CMOS inverter and the other. I'm sorry, I can't remember this word. I don't know why. It's a block. Theirs goes through a VDD internal power rail. Why isn't that enough to make it different and non-infringing? And so what Judge Chin said in his opinion in Appendix 6, he said whether they call it a VDD or not is not the dispositive issue. It's where does the power come from? Where does that connection lead from? And so what we showed at trial was that the accused products, just like claim one of the 623 patent, the accused products connect to a voltage stabilizer, which in turn derives its power from the third terminal. But it's not just a question of terminology. The statements that you made to the patent office talk about VDD power rail and things like that. So that has some meaning, and you told them what it is. I mean, I don't see that we can resolve this by saying, oh, well, we don't have to be concerned about the use of the VDD power rail because they were just really talking about a voltage stabilizer. I mean, it has meaning. And in fact, there was evidence that the power rail, VDD power rail, plays a role internal to the chip in the accused device. And so you're correct. The accused devices in the internal schematics, they do use the designation VDD. But what is indisputed is that connection is still through the voltage stabilizer and the third terminal. The jury found that. But the question is, when you were telling the patent office, we don't connect through a VDD power rail, did you mean any kind of VDD power rail, or did you just mean VDD power rail that's external, not internal? I'm very glad that you asked that question. So what we should do is try to understand. I understand. That's your argument. But both of you are pointing to different things back and forth, and I think Judge Chen accepted your argument. How do we know that's what you disclaimed was only the external, not the internal power rail? Yes, Your Honor. So I would point the court to Appendix 411. So this is the declaration of Dr. Zane that was submitted concurrently with the office action response that we've been discussing today. This is your expert, right? Yes, it is. And this is the same expert that testified at trial. And so what you'll see here is that, well, I should start on the preceding page, Appendix 410. But Dr. Zane goes through the exact same exercise that the counsel for OptiCarn went through. He cites to Column 6. He describes that there's two different ways of using a CMOS, either conventional or unconventional. And then in Paragraph 22 he says, the nontraditional and unconventional use of the CMOS inverter connected in a specific way in a three-terminal switch as required by Claim 1, but not connected to a power supply VDD via a fourth terminal, referred to in the quotation above as positive supply voltage plus V. What Dr. Zane is explaining is that the unconventional way doesn't go to a fourth terminal. He's not disclaiming the use of the word VDD or the use of the word power rail. What he's explaining is that 623 patent, Claim 1, specifically Limitation C of Claim 1, claims the unconventional use of a CMOS. That's supported in the specification. And that's what was addressed during the reexamination. But the problem that I have is you unsuccessfully argued to the PTO that this was different because the prior art had this fourth terminal with a VDD power rail in it. And we don't have that, and they didn't accept that. So you had to come up with something else. And something else looks to be we don't have a VDD power rail at all, even without the fourth terminal. So if you don't have a fourth terminal, the VDD power rail disclaimer has to relate to the use of the VDD power rail within the chip, internal to the chip. So, Your Honor, I would clarify that with, I do not believe that the examiner rejected or set aside the three versus four argument after the initial patent owner's statement. So if you look at Appendix 328, this is the office action that immediately precedes the response that we've been looking at. Appendix 328, the examiner walks through and talks about how the 323 is a three-terminal device, but was under the misunderstanding that it had a voltage stabilizer disclosed, but in any event didn't show a CMOS inverter. And what it says for the grounds of rejection here is that any conventional CMOS inverter, this is the last paragraph of the page, any conventional CMOS inverter you could use, therefore the CMOS inverter taught by Morris in combination with 323 or by extension, new for in combination with 323, that would be the invalidation. That was the point that the patentee was addressing in the December office action response, was you can't take any traditional or regular CMOS inverter and just drop it into the 323. Can I just back up and see if I understand you? To the extent we're talking about four versus three, you're saying your three matters because the traditional art using a CMOS all had four. And the examiner said, well, you can just plug in a CMOS to a three, so the four versus three distinction doesn't matter. And your response to further that was, in a three you can't just plug in a CMOS. So four versus three doesn't matter for some other things, but for the CMOS inverter it does. It's still part of the same story. And that's what the patentee had to explain to the examiner. They had to kind of clarify the first misunderstanding, which was that there was a voltage stabilizer in the 323 and there was not. And that was what the first half or so of the office action response was walking through. But the second part was why you couldn't just take any CMOS and drop it in, because it's the unconventional use. There was no fourth terminal to connect to the CMOS inverter to. It only had the three. And that's why the invention had to use the novel connection of going through the voltage stabilizer, which in turn derived its power from the third terminal. But you agree there's a difference between the voltage stabilizer and the VDD power rail, right? I don't know that I agree with that. I think VDD is just a designation that is used. In the accused product and in the patent, that's the third terminal through the voltage stabilizer. But in the prior arc... Does that mean that VDD power rail doesn't have a V in the arc? I think it has a meaning, and it just depends on which way that we're looking at this. If it's under the accused products and the patent ensued, it's the third terminal supplied through the voltage stabilizer, because that's what they label in their schematics as VDD. But in the prior arc, these were all four terminal devices that were using CMOS inverters, and so the VDD was to the fourth terminal. Yeah, but I get... You make me nervous when you say that you don't know what a VDD power rail is. Is it... I mean, these circuits are all just a bunch of wires or something. Please forgive my ignorance, but I'm doing my best here. When you're talking about VDD, it's just the place in the circuit where the power is coming through. It's not you go and buy something that's called a power rail and put it into a chip, is it? That's correct, and that's why Judge Chin, in his opinion, said it doesn't matter what we call it. We have to look where it's connected. And that's why, when you look at the briefs, it seems like you're talking about two different things. We believe OptiCurrent has been consistent across both trial and at... I mean, you and your friend on the other side talking about two different things. I disagree with Mr. Schorkenbach's characterization that there was a disclaimer of VDD as a whole. That simply is not the case. But you also disagree with him on what VDD means, right? He seems to interpret VDD to take some larger meaning that would connote whether it's connected to a third or fourth terminal. In my opinion, it doesn't. VDD is a particular voltage. It's a power line that supplies a particular voltage, right? Yes. It's different from a voltage stabilizer in the fact that it's providing current, whereas the voltage stabilizer is just keeping the voltage the same. Answer my question. I believe the voltage stabilizer supplies the power. The difference between the two is the voltage stabilizer keeps the voltage stable, whereas the VDD power line provides current. I'm not sure that I... It's current. I'm not sure that I see the distinction there. In my mind, the... One is just fixing the voltage. The other one's supplying current. I believe the voltage stabilizer connects to the third terminal. That's a wildly varying voltage. And so what it does is it corrects that voltage to a usable amount and provides that for operational use of the CMOS inverter. So that's the role of the voltage stabilizer. Now, if you had just taken the voltage stabilizer out and connected it to a fourth terminal VDD, well, then you could set that to be the amount that would be required for the CMOS inverter. Unless there's any further questions from the court, I would yield the podium. Anything more? No. Okay. Mr. Schuchenbach, you've got 2 minutes. Let me just go in reverse order and deal with this 3 versus 4 terminal issue again. No, I don't want to hear about that first. I want to hear about how these chips function and what the difference is. They both have power coming in through the same output drain portion, right? Yes. And they both send the power to a voltage stabilizer. Yes. And then it flows through, and your main view is somehow the circuit's flowing it through before it gets to the CMOS inverter is an internal power rail in your device. Exactly. And that they disclaim that internal power rail. Exactly. But what are the stuff that's flowing through in your internal power rail different than how they describe their invention? Is it not the same way? Is it not that power comes in through the drain, the stabilizer turns it into a usable current for the CMOS inverter and sends it on to the CMOS inverter? The first two things are the same. The power comes in through the drain. It goes to a voltage stabilizer. That's in their invention. That's in our chip. Here's the difference. In our chip, it goes from the voltage stabilizer to the VDD distribution network, and then it goes to the inverter. There is an intervening physical circuit structure known as VDD in between the two. Is the stabilizer in your invention what builds up the voltage to the correct amount to power the CMOS inverter? Yes. So that's our device. So you say that your device, the VDD, not only sends power to the CMOS inverter but can also potentially send power to other parts of the chip. Exactly. It's a network. Think of it as a network. Their device, both as shown in their figures as described in column 6 and as explained in detail to the examiner, no VDD. The voltage stabilizer is connected directly to the CMOS inverter, and that is the feature of their invention. What do we do with the fact that after three separate hearings or four separate hearings, Judge Chen ultimately concluded that it doesn't matter what we call it, that it's not a question of whether it's a VDD or not. It's a question of how you are charging this CMOS. So I think what you do with that is this. Number one, Judge Chen in the end became focused only on whether there was a contradiction or not between the re-exam and the trial, and he never actually engaged on whether the claim scope had been changed. Then why shouldn't he be doing it in the first instance? Well, for the reasons we explained in our brief, which is the claim scope has changed, there's definitely a disclaimer here, and the question is what are the implications of that disclaimer? You're asking for extraordinary relief, and your brief doesn't even explain really why you're entitled to it. So at best, shouldn't we send this back to Judge Chen to see if there's a distinction in the scope? Well, we would be okay with that because he never in the first instance actually analyzed independent of contradiction or not whether the claim scope has changed, but with respect I believe we did say in our brief that for 60B2 and 60B5, 60B2 is newly discovered evidence 60B5 is prospective relief that the change in claim scope as a result of their disclaimer triggers both of those provisions. Well, it can't trigger 60B2 because it was not evidence that it has to be evidence that existed at the time and that was not disclosed. You're right. I misspoke, and it's important to speak. What existed at the time is their understanding and their belief that their invention scope was limited in this way. And if that had been known at the time, we wouldn't be here. But they just pointed to the particular part of the re-exam where the PTO described their understanding and it had nothing to do with what your understanding is. If all we conclude that they disclaim is a conventional method of connecting a CMOS inverter which required connection to a positive power source through a fourth terminal, and I know you disagree with that, but if that's all they require, where are we left in this case? Why is all your discussion about an internal BDD relevant? Well, I think, I mean, if your hypothetical is that there's no disclaimer and as long as a chip gets power through a fourth terminal, as long as the inverter gets power somehow ultimately derived from the fourth terminal, where are we? Well, then we lose. But that's, I hope, not where we are. All of these arguments and all of these distinctions they draw where they say these are claim limitations. They have to mean something. And the last thought I'll leave you with, and again I appreciate the court being very generous with the time, look at the key argument on Appendix 389 to 91. You will not see a single reference to fourth terminal, power coming in through fourth terminal, four terminals versus three terminals. But there is a parenthetical that refers back to the normal way, the conventional way. The conventional way they're talking about here in context has nothing to do with... But it refers back to the prior paragraph where they describe the conventional way to be with the fourth terminal. No, no, no. And that's, I mean again, there's a lot of words here. There's no reference to the fourth terminal whatsoever. It's all about how the CMOS inverter is connected to the voltage stabilizer. There's no fourth terminal in sight. And that's why this is so confusing. It was so confusing for Judge Chan. We had three hearings because OptiCurrent kept wanting to go there and to sweep this under the rug and say this is all just the same as the previous one. It's not. It's not what they said. Okay. I think we're out of time. Thank you. Thank both counsel. The case is submitted. That concludes our session for this morning. All rise. November 4th adjourned until tomorrow morning at 10 a.m. Thank you.